**Norman J. WALLACE, Appellant,**

v.

**SPENCER CONSTRUCTION CO., Inc., Appellee.**

**No. 17421.**

Court of Civil Appeals of Texas, Dallas.

March 20, 1970.

Rehearing Denied April 3, 1970.

Stonewall Van Wie, III, Edwards, De-Anda & Arnett, Corpus Christi, for appellant.

Porter K. Johnston, Touchstone, Bernays & Johnston, Dallas, for appellee.

CLAUDE WILLIAMS, Justice.

Norman J. Wallace brought this action against Spencer Construction Company,

Inc. to recover damages for personal injuries. Following a jury trial a special issue verdict was returned in which the jury found that the employees of Spencer Construction Company, Inc. were guilty of three acts of negligence which proximately caused Wallace's injuries and also found that Wallace was guilty of two acts of contributory negligence which proximately caused his injuries. Wallace filed his motion to disregard the jury findings convicting him of contributory negligence but such motion was denied and the trial court proceeded to render a take nothing judgment.

Appellant brings to us ten points of error in which he assails the submission and the jury's answers to special issues which convicted him of contributory negligence. The issues, and their answers, which are attacked, are:

Special Issue No. 12: "Do you find from a preponderance of the evidence that on the occasion in question Norman Wallace failed to keep such a lookout for his own safety as a person using ordinary care would have kept?", to which the jury answered "Yes". Conditioned upon an affirmative answer to Special Issue No. 12 the court submitted Special Issue No. 13, as follows: "Do you find from a preponderance of the evidence that such failure was a proximate cause of his injury?", to which the jury answered "Yes".

Special Issue No. 15: "Do you find from a preponderance of the evidence that on the occasion in question the failure of Norman Wallace to tell the Spencer Construction Company foreman that he was going under the rear of his truck was negligence?", to which the jury responded "Yes". Conditioned upon an affirmative answer to this issue the court inquired: Special Issue No. 16: "Do you find from a preponderance of the evidence that such negligence was a proximate cause of his injury?", to which the jury responded "Yes".

Appellant divides his points into two groups. In the first group he contends that (a) Special Issue No. 12, and its related Issue No. 13, constituted a global submission of the issue of proper lookout and should not have been given; and (b) that there was no evidence to support the submission to the jury of Issues 12, 13, 15 and 16 or there was no evidence of probative force to support the jury's affirmative answer to each of Special Issues 12, 13, 15 and 16 so that such answers should have been disregarded and a judgment rendered in favor of appellant for the amount of damages found by the jury.

In his second group of points appellant contends that the judgment of the trial court should be reversed and remanded because the answers of the jury to Issues 12, 13, 15 and 16 are contrary to the overwhelming weight and preponderance of the credible evidence.

■ Before proceeding to a resolution of the points presented by appellant we take note of appellee's first and second counterpoints wherein it objects to our consideration of certain of appellant's points because of alleged defects in perfecting the record. In the first counterpoint appellee says that appellant's assignments of error contained in his motion for new trial, and which form the basis for the "no evidence" and "insufficient evidence" points, do not clearly and distinctly specify the ground of error complained of but are too general to require consideration by this court. We have carefully considered the various assignments and find that the same are quite adequate. We think the appellant has illustrated substantial compliance with Rules 320, 321, 322 and 374, Texas Rules of Civil Procedure. Appellee's Counterpoint 1 is overruled.

■ By its second counterpoint appellee objects to our considering certain of appellant's points relating to the submission of the issues set forth above because the objections and exceptions leveled at the

court's charge were not shown by the record to have been examined by the trial court and overruled by him as required by the rules. While this point may have had merit originally any defect in the record has been cured by the filing of a supplemental transcript which reveals a *nunc pro tunc* order by the trial court certifying that in truth and fact he did timely consider and overrule the objections and exceptions leveled to the court's charge, all in compliance with Rule 272, T.R.C.P. Appellee's second counterpoint is overruled.

■ Appellant vigorously attacks the court's action in submitting to the jury Special Issue No. 12, and its companion Issue No. 13, on the grounds that its form is such as to really amount to the submission of·a general charge or a broad and global submission which would permit the jury to take into consideration numerous facts going to make up the question of "proper lookout". In support of these contentions appellant cites us to no cases condemning the submission of a "lookout" issue but attempts to compare this type of situation with the "proper control" issue which has been condemned by our Supreme Court in Barclay v. C. C. Pitts Sand and Gravel Co., 387 S.W.2d 644 (Tex.Sup. 1965) and also the case of Roosth & Genecov Production Co. v. White, 152 Tex. 619, 262 S.W.2d 99 (1953), wherein the issue inquired as to "whether the derrick was defective" and was held to be global. We think that a careful consideration of the cases relied upon by appellant reveal distinctions which are clearly evident and render the authorities inapplicable to the situation presented here.

An analysis of Special Issue No. 12 demonstrates that the court confined the consideration of the jury to the specific determination of whether Wallace failed to keep a proper lookout "for his own safety" as a person using ordinary care would have kept under the circumstances demonstrated by the evidence before the jury. To sub-

mit the case in any other fashion would call for the submission of multiple fragments of the same question. In H. E. Butt Grocery Co. v. Johnson, 226 S.W.2d 501 (Tex.Civ.App., San Antonio 1949, writ ref'd n.r.e.), a slip and fall case, the defendant had pleaded that the plaintiff had failed to keep a proper lookout for her own safety. The trial court submitted a number of fragmentized issues and then submitted the general issue in practically the same wording as is submitted in this case. Justice Norvell, in reversing plaintiff's judgment, said that the appellant was entitled to a straight-out and clear-cut submission of its properly pleaded affirmative defense of lack of proper lookout. In Traywick v. Goodrich, 364 S.W.2d 190 (Tex.Sup. 1963), the court approved the general issue of "proper lookout" and said that such issue should not be fragmentized. Again in Texas & Pacific Ry. Co. v. Snider, 159 Tex. 380, 321 S.W.2d 280 (1959), Justice Calvert condemned the "submission of multitudinous special issues", saying: "We can perceive of no sound reason why one special issue on failure of Snider to keep a proper lookout for his own safety as he approached the crossing, related to the facts and circumstances in evidence, would not have been adequate to cover all of the issues mentioned."

In view of these authorities we believe that Special Issues 12 and 13 were not subject to the objections made and therefore appellant's points are overruled.

■■ We turn now to consideration of appellant's "no evidence" and "insufficiency of the evidence" points. The question of "no evidence" is one of law and our judicial review of such question imposes upon us a duty to consider only the evidence and the inferences favorable to the jury findings and to disregard all evidence and inferences to the contrary. Garza v. Alviar, 395 S.W.2d 821 (Tex.Sup. 1965) and Calvert, " 'No Evidence' and 'Insufficient Evidence' Points of Error", 38 Tex.

Law Rev. 361. Should we determine that there is evidence of probative force to support the submission of the issue, and its answer by the jury, then we must proceed to examine the "insufficient evidence" point to determine whether the evidence supporting the jury finding is so weak or the evidence to the contrary so overwhelming that the finding should be set aside and a new trial decreed. This involves a determination of a factual question as opposed to one of law. In reaching this determination we must consider and weigh all of the evidence in the case to decide whether there is a sufficiency of evidence to support the findings. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951).

A fair determination of both factual and law questions cannot be properly presented without a condensed statement of relevant background facts.

■ Spencer Construction Company was engaged in the business of building an approach to a bridge. Chemical Express Company was engaged in transporting dry cement and through some contractual arrangement with Spencer it delivered this material to the job site utilizing large trucks and trailers upon which rest large metal tanks. From the picture of the equipment it would appear that the truck and trailer are 30 or 40 feet in overall length and there are two sets of dual tandem wheels at the front and back of the trailer upon which the metal cement tank rests. Below the tank and about the middle is situated what is known as a "feeder box" from which is connected a flexible rubber hose about four inches in diameter and several feet long. Along the side of the tank is located one or more vibrators and there are other pieces of auxiliary equipment connected with the tank and designed to expedite the expelling of the cement from the inside of the tank. The unloading operation was carried on in the following manner: The truck and trailer unit was driven to a chosen site under its own power. A maintainer or road grader, owned by Spencer, would be placed in front of the truck and connected with it by a steel cable some 20 feet in length. This maintainer would pull the truck and trailer unit forward by its power. The truck and trailer unit did not go forward under its own power during the cement spreading operation because the tractor's engine was used to operate the pumping equipment such as augers, blowers and vibrators. As the maintainer pulled the truck and trailer unit forward a small tractor, owned by Spencer and driven by Spencer employees, pulled a "spreader box", setting on two wheels, in a forward position and at a location about four or five feet to the right side of the trailer. The flexible rubber hose connected with the feeder box on the trailer was hand-carried by a Spencer employee. The flexible rubber hose extended from the feeder box into the spreader box and when the tractor's engine was in operation the dry cement was forced through the flexible hose into the feeder box where the powdered cement was dispensed to the dirt roadbed surface below. As stated, the vibrators were located on the side of the trailer but the valves operating the vibrators were under the trailer frame. Another valve known as the "air valve" was located up under the forward pair of dual tandem wheels. In order to gain access to and operate the air valve it was necessary for the Chemical Express employee to get down under the trailer and tank and also get between the dual tandem wheels. When the equipment was in soft dirt this necessitated the employee to operate in a very limited area or space under the equipment.

Appellant Wallace was forty-six years old at the time of trial and on June 6, 1964, the date of his accident, he had been employed as a truck driver for eight years and for six years had been an employee of Chemical Express driving one of the pieces of equipment described above. He had been engaged in doing the very same kind

of hauling of bulk cement and dispensing of same as was involved in this operation.

The testimony of the witnesses is not without conflict as to the general procedures used on this and similar jobs for the unloading of the tank trailer into the spreader box for dispensing of the powdered cement. It is fairly established that generally when the tractor-trailer came onto the job and moved into the position for unloading, certain mechanical functions had to be performed, such as hooking up the blower hose and the spreader hose being attached. When the maintainer was hooked onto the tractor and the small tractor was hooked onto the spreader alongside the trailer and everything else was ready a system of starting signals was utilized and the pieces of equipment moved forward together. A Spencer employee drove the maintainer and the small Farmall tractor pulling the spreader box. Spencer employees operated the hose to the spreader. A Chemical Express employee was solely responsible for the operation of the truck and trailer, with its variety of equipment.

Wallace and another employee testified that when the procession was ready to start off the men on the spreader would signal the Farmall driver who in turn would signal the appellant, who would be sitting in the truck cab, who would then blow his air horn to signal the maintainer operator to start pulling. One reason for these signals was that there was a great deal of noise caused by the operation of the various pieces of equipment on the trailer and this tended to drown out communication by voice. Appellant testified that the procedure for stopping was practically the same as that of starting. Wallace said that his unit had never moved forward without his starting signal having been given by blowing his horn and that there had been four prior unloadings on the job just before his accident. The driver of the maintainer testified that he was instructed not to start off without a signal and also to see that the truck driver was in the cab. There was a conflict in the evidence concerning this fact. There was also testimony concerning another starting and stopping procedure which was used on these unloading jobs. The Spencer road boss testified that hand signals were sometimes given for starting and also that very often the vibrators on the trailer would give trouble and the drivers would have to get out of the cab of the truck while it was in motion and walk back and use rubber hammers to hit the sides of the tank to aid the unloading process. He said there was a different operation for starting off and there were varieties of procedures used with the same truck. He testified that he had seen these truck units pulled off by the maintainer without the driver of the truck being in the cab and that there was no certain rule for him to be inside the cab and behind the wheel. He said the rules would vary from time to time and that there was no established or inflexible rule. Wallace confirmed the testimony of the road boss when he admitted that the truck drivers frequently had to get out of their trucks while the unit was in motion and go back and perform procedures to remedy difficulties in the unloading process, all without signal being given. Thus, while Wallace testified concerning a formal procedure relative to starting and stopping there was other testimony from other witnesses which clearly indicated that the starting and stopping procedure was informal, changing from situation to situation, even with the same truck.

Wallace testified that he, being in charge of the truck and trailer, knew and realized the danger involved in crawling under the trailer and back under the tandem wheels where the air valve was located. He said that while a person was in such a position, obviously cramped, that he would be in danger if the unit started forward.

On the day in question Wallace had driven the Chemical Express truck to the job site and it had been connected with the

maintainer as above described. The entire unit, including the maintainer, truck, trailer, tractor and spreader, had started in motion. About the time the process was about half completed, that is, about half of the 72,000 pounds of cement being discharged, something happened to cause the trailer to stop supplying cement to the feeder box. The procession stopped and Wallace got out of the truck and went back to the trailer to activate the vibrators, doing so by switching an emergency switch, causing a valve to open. He returned to the truck and got back in and the unit started off again. There was no testimony that a signal of any kind was given either to stop the unit or to start the unit on this occasion. A short time later something happened to the air supply and the vibrators on the trailer stopped which required the procession to come to another stop. This was done, according to Wallace, by him giving a signal to the maintainer operator to stop. According to Wallace, after the truck came to a stop he got out of the cab and just then the Spencer foreman came by and told him that the vibrators had quit working and that the cement was not falling; that he would have to get it working or "he would have to pull another truck in." Wallace testified that he told the foreman that all he would have to do would be to close an air valve on his trailer. He said the foreman told him, "Do it," and then turned and walked toward the maintainer operator, who would be about 20 feet ahead of the truck. According to Wallace he ran back along the left side of the truck and trailer unit until he reached the back tandem wheels and then ducked down and crawled under the front dual tandem wheels and started to cut off the valve located underneath the unit. He said that just as he reached over to catch the valve he felt the truck starting slowly up in forward motion. He said he immediately turned and whirled to his right and tried to jump out from under the unit but his right shoulder hit the tire rack and knocked him over against the wheels of the trailer; that he made a second try and jumped and finally managed to pull himself from under the truck. The tires of the truck did not run over him. He got up and went back to the cab of the truck which was moving forward and crawled in the cab. He testified that he told the foreman what had happened to him. The foreman denied that Wallace had said anything to him about being injured. Wallace said that before he crawled under the truck he did not take any notice of where any of the other members of the crew working for Spencer were located or what they were doing. He said he did not give any warning to the operator of the tractor before he went under the trailer wheels because to do so would require him to go all the way around the unit. He admitted he could see the tractor driver from under the vehicle had he looked. It is also without dispute that Wallace did not tell the Spencer foreman where he was going to perform his function as he turned and ran to the back of the unit.

There is no evidence as to why the unit started forward or who gave any signal for the movement to be made, if a signal was given. None of the other employees knew anything about the alleged accident.

From this summary of the evidence, together with all of the evidence adduced upon the trial of this case, which we have carefully considered, we are of the opinion and so hold that there was competent evidence to justify the submission by the trial court of the special issues copied above. We are also of the opinion that, as a matter of law, there was evidence of probative force to support the jury's answers to the respective Special Issues Nos. 12, 13, 15 and 16. In addition, we find as a fact that the answers of the jury to the various special issues are not contrary to the overwhelming weight and preponderance of the evidence so as to be manifestly unjust and thereby requiring same to be set aside.

It is elementary law that the jury is the sole judge of the facts and circumstances proven and that they may also

draw reasonable inferences and deductions adduced before them. The jury findings may not be disregarded under the provisions of Rule 301, T.R.C.P., if the record discloses any evidence of probative value which, with inferences that may be properly drawn therefrom, will reasonably support the same. It is also elementary that both negligence as well as contributory negligence may be inferred from the circumstances surrounding an event, so that it is not necessary to prove these elements by positive and direct testimony. Houston, E. & W. T. Ry. Co. v. Boone, 105 Tex. 188, 146 S.W. 533 (1912). In considering the value to be placed upon testimony the jury's function is to weigh the credibility of the witnesses and the weight to be given their testimony and this is more especially true with respect to the testimony of parties or other persons interested in the litigation.

It is to be observed that the testimony adduced in this record is far from being in agreement but, to the contrary, contains contradictions and discrepancies which the jury was bound to resolve. It is without dispute that Wallace was in charge of the particular unit together with its complex auxiliary machines and tools. He is bound by law to have a superior knowledge of the mode and manner of causing these various units to operate properly and to perform their function. The whole procession moved forward as a unit but with part of the unit being under the control of Wallace and the other part being under the control of Spencer employees. We think that the jury was perfectly justified in the light of this picture presented to find that Wallace owed a duty to keep and maintain a proper lookout for his own safety at the time he ran back and dived under the wheels of the trailer and placed himself in a position known to him to be dangerous if the unit started forward. He argues that there was no duty on his part to keep a proper lookout because he could rely upon a standard procedure for starting and stopping the procession and that it had never started up without the standard signals

being given and the driver of the truck being in the cab under the wheel. He is wrong in two particulars. In the first place, the testimony is conflicting concerning rules and procedures. There was no published or standard rule in force as was in St. Louis Southwestern Ry. Co. of Texas v. Pope, 98 Tex. 535, 86 S.W. 5 (1905). Secondly, although Wallace was not required to anticipate negligent conduct on the part of others the law does not entitle him to close his eyes to that which was plainly visible and which would have been observed by a person of ordinary prudence similarly located. Lynch v. Ricketts, 158 Tex. 487, 314 S.W.2d 273 (1958).

Concerning the issue relating to the failure of Wallace to tell the foreman that he was about to go under the rear of his truck, and its companion issue of proximate cause, the evidence is undisputed that Wallace did not tell the foreman where he had to go in order to fix the problem that had caused the unit to come to a stop on the last occasion. Wallace knew that the foreman was not charged with responsibility of the trailer and he also knew that the foreman was walking toward the maintainer operator, the person who was in charge of the power to pull the unit, at the time he ran towards the rear of the trailer and went underneath. The jury, from this evidence, could well conclude that a person of ordinary care would have been cautious enough to convey to the foreman the information that he was about to place himself in a potentially dangerous situation and thereby warn him, as well as the other employees, not to start the unit until he extricated himself from such dangerous position.

Having carefully evaluated all of appellant's points of error in accordance with appropriate rules of judicial review as prescribed by our Supreme Court, we find no merit in any of the points and therefore overrule same.

The judgment of the trial court is affirmed.